**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

ANDREW JOEY DELGADO,

      Plaintiff,

v.                                      No. CV 15-676 WJ/CG

NEW MEXICO DEPARTMENT OF
CORRECTIONS, et al.,

      Defendants.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

**THIS MATTER** is before the Court on Plaintiff Andrew Joey Delgado's *Prisoner's 1st Amended Civil Rights Complaint*, (Doc. 19), filed May 9, 2016; Defendants Bixenman, Calvillo, and Douglas' Martinez *Report and Motion for Summary Judgment* (the "*Martinez* Report," "Report," or "Motion for Summary Judgment"), (Doc. 65), filed November 15, 2017; Plaintiff's *Motion in Opposition to Defendants' Bixenman, Calvillo and Douglas' Martinez Report/Summary Judgment*, (Doc. 85), *Statement of Disputed Facts*, (Doc. 86), and *Affidavit of Andrew Joey Delgado* (collectively, the "Response" or "Plaintiff's Response"), (Doc. 87), all filed March 5, 2018; and Defendants' *Reply in Support of* Martinez *Report* (the "Reply"), (Doc. 88), filed March 19, 2018. Also before the Court are Defendant's *Supplement to* Martinez *Report*, (Doc. 90), filed July 6, 2018; Plaintiff's *Response to Defendants Bixenman, Calvillo, and Douglas' Supplement to Martinez Report*, (Doc. 94), filed August 13, 2018; and *Defendants' Bixenman, Calvillo, and Douglas' Reply in Support of Supplemental* Martinez *Report*, (Doc. 97), filed August 27, 2018. Finally, Plaintiff's *Motion to Suspend Summary Judgment* (the "Rule 56(d) Motion"), (Doc. 79), filed February 12, 2018; and Defendants' *Response to Plaintiff's*

*Motion to Suspend Summary Judgment* (the "Rule 56(d) Response"), (Doc. 82), filed February 13, 2018, are also before the Court.

Chief United States District Judge William P. Johnson referred this case to Chief United States Magistrate Judge Carmen E. Garza for proposed findings and a recommended disposition. (Doc. 3). Having reviewed the record, the briefing, and the relevant law, the Court **RECOMMENDS** that Plaintiff's Rule 56(d) Motion be **DENIED**; that Defendants' Motion for Summary Judgment be **GRANTED**; and that this case be **DISMISSED WITH PREJUDICE**.

## I.    Background

On May 3, 2014, Plaintiff was cleaning his cell at the Lea County Correctional Facility ("LCCF") with his cell door propped open and his right hand in the door jamb, when the door suddenly slammed shut on his hand and wrist. (Doc. 19 at 4). Plaintiff says he showed his hand to guards and nurses, who recognized he needed treatment, but he did not actually receive treatment until ten days after the incident. (Doc. 65-8 at 3; Bates number ("BN") 123). On May 13, 2014, Plaintiff denied hearing or feeling a popping sensation when he was injured, and Defendant Bixenman, a physician's assistant, noted Plaintiff had bruising, a full range of motion, and strong bilateral grip strength. *Id.* Defendant Bixenman diagnosed Plaintiff with a hand/thumb sprain with a risk of fracture, wrapped Plaintiff's wrist in a bandage, prescribed ibuprofen, and ordered x-rays. *Id.* X-rays taken another ten days later, on March 23, 2014, revealed Plaintiff had indeed suffered fractures in his hand and wrist. (Doc. 65-11 at 13-14). Plaintiff's hand and wrist were not treated again until June 18, 2014, when Defendant Bixenman splinted his wrist and prescribed more pain medication. (Doc. 65-7 at 15).

Over the next year, Plaintiff experienced several more delays in receiving medical attention, which he says did little to resolve his injuries.

Ultimately, Plaintiff filed civil rights complaints against LCCF, the New Mexico Department of Corrections, the medical provider at LCCF, and several individuals. *See* (Doc. 1), (Doc. 12), (Doc. 19). Following initial review of Plaintiff's complaints, all but three defendants were dismissed. (Doc. 24). The three remaining defendants are Defendant Bixenman; Defendant Calvillo, the Director of Nursing at LCCF; and Defendant Douglas, LCCF's Health Services Administrator. Plaintiff alleges these individuals violated his Eighth Amendment rights by being deliberately indifferent to his serious medical needs. (Doc. 19 at 14). Plaintiff argues these Defendants were personally responsible for inadequate medical treatment and delays Plaintiff experienced in receiving that treatment. *Id.* at 6, 14. As a result, Plaintiff states he experiences constant discomfort in his hand and wrist and that he will be unable to return to his career as an automotive technician. *Id.* at 14.

After the initial screening of Plaintiff's complaints, the Court ordered Defendants to compile and file a *Martinez* Report in order to ascertain the legal and factual bases for Plaintiff's claims. (Doc. 51 at 2). The Court noted it may consider the *Martinez* Report in deciding summary judgment and provided specific instructions. For example, the Court ordered Defendants to file an index along with the Report and to describe any contracts, policies, procedures, protocols, laws, or regulations pertinent to Plaintiff's claims. *Id.* at 5. The Court also ordered Defendants to file any motions for summary judgment separate from the Report. *Id.*

Contrary to the Court's Order, Defendants filed the *Martinez* Report and asked for summary judgment in the same pleading. (Doc. 65 at 1). The Report also did not contain an index or describe any contracts, policies, etc., pertaining to Plaintiff's claims. Accordingly, the Court ordered Defendants to supplement the *Martinez* Report with the contracts, policies, and grievances related to Plaintiff's claims. (Doc. 89). Defendants provided the additional information in a supplemental *Martinez* Report, filed on July 6, 2018. (Doc. 90). Plaintiff filed a response to the supplemental *Martinez* Report on August 13, 2018, (Doc. 94), and Defendants filed a reply in support of the supplemental *Martinez* Report on August 27, 2018.

In their Motion for Summary Judgment, Defendants argue that Plaintiff's medical records show he received almost monthly treatment for his hand and wrist, including several x-rays, two CT scans, splints and braces, and consultations with specialists. (Doc. 65 at 1-14). Defendants claim Plaintiff received regular, attentive medical care, and there is no genuine dispute of material fact as to whether Defendants intentionally delayed, denied, or interfered with Plaintiff's care. *Id.* at 14-17. Although Plaintiff may disagree with his treatment, Defendants contend he cannot show they had the "culpable state of mind" necessary to establish an Eighth Amendment violation. *Id.* at 17.

In response to the Motion for Summary Judgment, Plaintiff argues the delays he suffered in receiving treatment and the inadequacy of the treatment itself constitute Eighth Amendment violations. (Doc. 85 at 16-20). Plaintiff contends it was Defendant Bixenman's responsibility to treat Plaintiff and make regular appointments, Defendant Calvillo's responsibility to ensure those appointments were kept, and Defendant Douglas' responsibility to oversee Plaintiff's medical care. *Id.* at 10. Plaintiff highlights

4

the ten-day delay between his injury and his initial treatment by Defendant Bixenman, the delay between having x-rays taken and being splinted, and the fact that his hand and wrist were never placed in a cast as particular instances of delayed or denied medical treatment. *Id.* at 16, 20.

In reply to their Motion for Summary Judgment, Defendants again argue that Plaintiff cannot show Defendants were deliberately indifferent to Plaintiff's needs. (Doc. 88 at 1). Plaintiff emphasizes the pain he suffered as a result of allegedly inadequate and untimely treatment, but Defendants maintain that Plaintiff's allegations establish medical malpractice at best, which is insufficient to establish and Eighth Amendment violation. *Id.* at 3-4. Accordingly, Defendants request summary judgment in their favor as there are no genuine issues of material fact and Defendants are entitled to judgment as a matter of law.

In addition, in response to the supplemental *Martinez* Report, Plaintiff states that Defendants failed to follow policies related to inmate care. (Doc. 94 at 1-3). In particular, Plaintiff contends that policies related to daily sick call, staffing ratios, and responding to health care requests were not followed. *Id.* Plaintiff argues Defendants intentionally failed to follow those policies, which shows deliberate indifference. *Id.* at 3. Plaintiff also argues Defendants failed to provide the job description for Defendant Douglas as Health Service Administrator, and failed to produce Defendants' annual peer reviews. *Id.* at 3-4.

In their reply to the Supplemental *Martinez* Report, Defendants contend Plaintiff failed to support his allegations that Defendants failed to follow policies, and did not provide evidence linking Defendants to these alleged failures. (Doc. 97 at 1-2).

Defendants state the job description of the Health Service Administrator was inadvertently left out of the supplemental *Martinez* Report, and they provide a copy of it as an exhibit to their reply. *Id.* However, they contend it does not support any of Plaintiff's claims. *Id.* at 2. Defendants argue their annual peer reviews are not discoverable and, even if they were, they are not relevant to Plaintiff's claims. *Id.* Defendants again state that Plaintiff's allegations amount to medical negligence claims, not Eighth Amendment violations. *Id.* at 2.

Plaintiff also filed a Rule 56(d) Motion. Plaintiff asks the Court to defer considering the Motion for Summary Judgment until Plaintiff has an opportunity to obtain materials not included in the *Martinez* Report. (Doc. 79 at 1-2). In particular, Plaintiff is waiting to receive unspecified medical policies, a response from a correctional officer regarding a medical policy on inmate medical documents, and a response from journalists who work for the Santa Fe New Mexican regarding an investigative report they authored about lawsuits over medical care in New Mexico prisons. (Doc. 79 at 4-6). Defendants counter that Plaintiff has not described how those materials affect whether or not Defendants were deliberately indifferent to his serious medical needs, therefore the motion should be denied. (Doc. 82 at 2-3). Plaintiff did not file a reply in support of this motion.

## II. Analysis

As discussed, Defendants have moved for summary judgment, while Plaintiff has moved to suspend summary judgment under Rule 56(d). Because Plaintiff's motion affects whether to consider Defendants' motion at this time, the Court will address Plaintiff's Rule 56(d) Motion before proceeding to the Motion for Summary Judgment.

*A. Plaintiff's Rule 56(d) Motion*

Plaintiff has moved to defer ruling on the Motion for Summary Judgment until he receives various documents in discovery. (Doc. 79). Plaintiff states he is waiting to receive a statement from a correctional officer regarding a medical policy pertaining to inmate medical documents, other unspecified policies, and a response from journalists regarding an investigative report they authored on medical care in New Mexico prisons. *Id.* at 4-5. Plaintiff claims this evidence supports his claims, but he does not identify how, or which claims they support. Defendants oppose deferring a ruling, arguing the information Plaintiff seeks is irrelevant. (Doc. 82 at 1-3). Defendants claim Plaintiff is pursuing a theory of the case based on alleged actions by non-defendants, rather than information related to care he received from Defendants. *Id.* at 3.

Under Fed R. Civ. P. 56(d), the Court may defer considering a motion for summary judgment "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition" to the motion. Rule 56(d) requires the nonmovant to "identify the probable facts not available and what steps have been taken to obtain those facts." *Comm. for the First Amendment v. Campbell*, 962 F.2d 1517, 1522 (10th Cir. 1992). If the information sought is "irrelevant to the summary judgment motion or merely cumulative," deferral is inappropriate. *Jensen v. Redev. Agency of Sandy City*, 998 F.2d 1550, 1553-55 (10th Cir. 1993).

In this case, Plaintiff has identified the information he seeks–unspecified medical policies and a response from journalists–but he has not explained how they are relevant to his claims that Defendants were deliberately indifferent to his serious medical needs. Although Plaintiff asserts this evidence would support his claim, he has not shown the

"probable facts" in the materials that would support his claims. Under these circumstances, deferring a ruling on summary judgment is not warranted. Accordingly, the Court finds that Plaintiff has not provided sufficient support for his Rule 56(d) Motion and therefore recommends denying the Rule 56(d) Motion.

### 1. *Defendants'* Martinez *Report and Motion for Summary Judgment*

### a. *Standards for Summary Judgment*

The Court shall grant summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if evidence exists such that a reasonable jury could resolve the issue in favor of the nonmoving party. *Id.* The movant bears the burden of making a *prima facie* demonstration that there is no genuine issue of material fact. *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670–71 (10th Cir.1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

If the moving party has demonstrated an absence of material fact, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587(1986) (internal quotations omitted). The mere existence of some evidence in support of the nonmoving party, however, is insufficient to deny a motion for summary judgment; rather, there must be enough evidence to enable a reasonable jury to find for the nonmoving party on that issue. *See Anderson*, 477 U.S. at 249. The nonmovant must go beyond the allegations and denials of his pleadings and provide admissible

evidence, which the Court views in the light most favorable to him. *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir.1995).

The purpose of a *Martinez* Report is to "develop a record sufficient to ascertain whether there are any factual or legal bases for the prisoner's claims." *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991). On summary judgment, a *Martinez* Report "is treated like an affidavit, and the court is not authorized to accept its fact findings if the prisoner has presented conflicting evidence." *Northington v. Jackson*, 973 F.2d 1518, 1521 (10th Cir.1992). A plaintiff's complaint may also be treated as an affidavit if it alleges facts based on the plaintiff's personal knowledge and is sworn under penalty of perjury. *Hall*, 935 F.2d at 1111. Thus, a court may not rely on a *Martinez* Report to resolve material disputed facts where the Report conflicts with pleadings or affidavits, nor can material disputed facts be resolved based on conflicting affidavits. *Id.* at 1109, 1111. A factual dispute exists even if the plaintiff's conflicting factual allegations are less specific or well-documented than the factual findings in the *Martinez* Report. *Id.* at 1109.

Finally, the Court must liberally construe a *pro se* litigant's pleadings, including Plaintiff's, and hold them to a less stringent standard than those drafted by an attorney. *See id.* at 1110. However, the Court may not act as a *pro se* litigant's advocate. *Id.* The Court "will not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997). In addition, Plaintiff, as a *pro se* litigant, must still follow the same procedural rules governing represented litigants. *Nielson v. Price*, 17 F.3d 1276, 1277 (10th Cir.1994).

## 2. *Legal Standards Under the Eighth Amendment*

Turning to the legal standards governing this case, prison officials and physicians violate the Eighth Amendment when their "deliberate indifference" to an inmate's "serious medical needs . . . constitutes the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "Inadvertent failure to provide adequate medical care" or negligent diagnosis and treatment are insufficient to find an Eighth Amendment violation. *Id.* at 105. Inmates must "allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106.

To determine whether officials have been deliberately indifferent to serious medical needs, the Supreme Court has set forth a two-pronged test "comprised of an objective and subjective component." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The objective prong is met where a medical need is "sufficiently serious" to constitute a constitutional violation. *Id.* A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment" or "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999).

Under the subjective prong, prison officials "must have a 'sufficiently culpable state of mind.'" *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (quoting *Farmer*, 511 U.S. at 834). This prong is met where a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. "Whether a prison official had the requisite knowledge of substantial risk is a question of fact subject to demonstration

in the usual ways, including inference from circumstantial evidence." *Id.* This is "a high evidentiary hurdle: a prison official must know about and disregard a substantial risk of serious harm." *Self*, 439 F.3d at 1232.

The Tenth Circuit has recognized two broad situations where the subjective prong may be satisfied through a medical professional's conduct. First, "a medical professional failing to treat a serious medical condition properly" could show deliberate indifference. *Self*, 439 F.3d at 1231. For instance, in *Oxendine v. Kaplan*, the Tenth Circuit reversed dismissal where a prison doctor recognized and ignored symptoms that an inmate's fingertip was gangrenous. 241 F.3d 1272, 1278-79 (10th Cir. 2001). According to the complaint, the doctor repeatedly observed the decaying finger but did nothing until it was too late. *Id.* at 1279.

Second, prison officials may be deliberately indifferent to a serious medical need by "preventing an inmate from receiving medical treatment or denying access to medical personnel capable of evaluating the inmate's condition." *Self*, 439 F.3d at 1231. In *Sealock v. Colorado*, for example, the Tenth Circuit reversed summary judgment where a physician's assistant failed to call for emergency help even though he knew an inmate could have been suffering a heart attack. 218 F.3d 1205, 1211-12 (10th Cir. 2000).

However, the Tenth Circuit has also held that, "absent an extraordinary degree of neglect," the subjective prong is not satisfied "where a doctor merely exercises his considered medical judgment." *Self*, 439 F.3d at 1233. The "negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation." *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999). Put differently, "[s]o long as a medical professional provides a level of care

consistent with the symptoms presented by the inmate, absent evidence of knowledge or recklessness, the requisite state of mind cannot be met." *Self*, 439 F.3d at 1233.

### 3. *Material Facts as Presented by the Parties*

With the above standards in mind, the Court will discuss the facts as presented in the *Martinez* Report as well as Plaintiff's Response. The Court will note where the parties disagree, with particular attention to disputes Plaintiff argues are genuine and material, and will view the facts in the light most favorable to Plaintiff. As more fully explained below, Plaintiff's claims largely relate to his initial treatment following his injury, with additional claims arising out of his overall treatment.

As discussed, Plaintiff alleges he first injured his hand on May 3, 2014, while cleaning his cell. (Doc. 87 at 2). Plaintiff states he filled out a Health Services Request Form ("HSRF") the next day, writing "I believe my hand is broken." *Id*. This HSRF is not in the record. According to Plaintiff, he saw a corrections officer named Fuentes ("CO Fuentes") the next day who told him to file another HSRF. *Id*. Five days later, on May 9, 2014, Plaintiff submitted a second HSRF, stating "I smashed my hand in the door and I think it is broken. It happened a couple days ago and [I] thought it would be ok but I'm sure it's broken because my hand is purple." (Doc. 65-8 at 3; BN 124).

Plaintiff states that on May 10, 2014, he complained to CO Fuentes that he still had not been treated. (Doc. 87 at 2). Plaintiff says that CO Fuentes directed him to go to the medical unit to be seen, but once there, an unnamed medical officer sent him away because they were "dealing with a situation." *Id*. The medical officer told Plaintiff to return the next day and to file a grievance if he did not receive treatment. *Id*. Plaintiff was locked down the next day, but an unidentified corrections officer asked a nurse to

examine Plaintiff's hand and wrist. *Id.* The nurse looked at Plaintiff's hand and said she would "let medical know." *Id.*

On May 13, 2014, LCCF was still on lockdown, but Defendant Bixenman examined Plaintiff's hand and wrist. (Doc. 65-8 at 2; BN 123). According to Defendant Bixenman's notes, Plaintiff complained of right hand and wrist pain at 5 on a scale of 10 following injury ten days prior, and he denied hearing or feeling a popping sensation when he was injured. *Id.* Defendant Bixenman indicated that Plaintiff's hand and wrist were tender and showed blue-green bruising, with no deformity or bone-grating, good bilateral hand grip strength, and a full range of motion. *Id.* Defendant Bixenman diagnosed Plaintiff's injury as "hand/thumb sprain/contusions." *Id.* Accordingly, she wrapped Plaintiff's hand and wrist in a bandage, prescribed ibuprofen, and ordered x-rays. *Id.* Plaintiff states he was told x-rays would be taken three days later, on May 16, 2014. (Doc. 87 at 3).

On May 18, 2014, Plaintiff filed an informal grievance, complaining that he was supposed to receive x-rays and had not been called to do so. (Doc. 87 at 49). Plaintiff avers that on May 22, 2014, Defendant Douglas met with him and told him the medical unit "made some mistakes, but correctional officers have made some mistakes as well. Let's go down to medical and see if you need to be transported right away to the hospital or if you can wait" for x-rays. *Id.* at 3.

On May 23, 2014, x-rays of Plaintiff's hand and wrist were taken. (Doc. 65-11 at 13-14; BN 191-92). Two days later, Plaintiff filed an HSRF requesting Tylenol instead of ibuprofen out of concern for his kidney. (Doc. 65-8 at 1; BN 122). On May 28, 2014, Plaintiff reported occasional numbing and tingling as well as pain at 3/10 to a nurse,

Nurse Bradshaw, who noted redness, bruising, and swelling, but no "joint involvement" or decreased range of motion. (Doc. 65-7 at 17; BN 121). Plaintiff also states Nurse Bradshaw told him it takes two weeks to receive x-ray reports and "there is a flaw in the system" because it should not take that long. (Doc. 87 at 4).

X-ray reports signed May 30, 2014, found that Plaintiff suffered acute fractures in his hand and wrist. (Doc. 65-11 at 13-14; BN 191-92). On June 2, Defendant Bixenman signed the reports and ordered an appointment with Plaintiff the next day. (Doc. 65-11 at 13-14; BN 191-92); (Doc. 65-2 at 6; BN 24). The appointment was not held. On June 12, 2014, Defendant Bixenman signed a Refusal Form indicating Plaintiff refused a sick call appointment and "refused to come sign" the form. (Doc. 65-15 at 6; BN 269). The form is also signed by two witnesses. *Id.* Plaintiff states that he never refused any sick call appointment. (Doc. 85 at 8). In his Response, Plaintiff argues that if he refused a medical appointment or refused to sign a Refusal Form, he would have been disciplined. *Id.* Since he was never disciplined, Plaintiff contends he never refused to attend an appointment or sign a Refusal Form. *Id.*

On June 13, 2014, one month after he was first treated, Plaintiff filed an informal grievance stating nothing had been done for him since x-rays were taken. (Doc. 87 at 22). On June 16, 2014, Plaintiff states that LCCF's Warden called Plaintiff into his office to discuss Plaintiff's grievances with his medical treatment. The Warden also called Defendant Douglas into the meeting. *Id.* According to Plaintiff, Defendant Douglas told him that if COs had taken him to medical right away, he would have been treated and sent to the hospital. (Doc. 87 at 4-5). Further, Defendant Douglas said it was taking time

to treat Plaintiff because there are not many orthopedists in New Mexico and they have to make an appointment. *Id.*

Meanwhile, also on June 16, Defendant Bixenman requested an off-site orthopedic consultation for Plaintiff. (Doc. 65-12 at 17; BN 220). Defendant Bixenman recorded her findings and noted the diagnosis of acute fractures. *Id.* The next day, Dr. Lisa Staber, the Regional Medical Director for LCCF's health provider, denied the request. In full, Dr. Staber wrote: "These are non-displaced fractures which do not require surgical intervention. Therefore, [Plaintiff] will need splinting of the finger and immobilization for 4-6 weeks, and cast immobilization for the wrist fracture for 4-6 weeks. All of this must be done on-site, with no need for off-site consultation." *Id.*

On June 18, 2014, Defendant Bixenman splinted Plaintiff's hand and wrist, prescribed more pain medication, and ordered follow-up x-rays. (Doc. 65-7 at 15; BN 119). X-rays taken the next day showed "no significant interval change" from Plaintiff's first x-rays. (Doc. 65-11 at 11-12; BN 189-90). On July 3, 2014, Plaintiff was seen for a follow-up appointment, at which he complained of mild pain and appeared to have less than full range of motion. (Doc. 65-7 at 13; BN 117; Doc. 65-2 at 6; BN 24). Plaintiff stated he wore the splint at all times except showering, and Defendant Bixenman prescribed pain medication and ordered a follow-up appointment and x-rays. *Id.*

One month later, on August 4, 2014, Plaintiff complained that he had his splint on for more than six weeks, was supposed to have more x-rays taken but did not, and medical had still not seen him. (Doc. 65-7 at 12; BN 116). On August 6, 2014, Defendant Bixenman completed another Refusal Form indicating Plaintiff refused an appointment, went to recreation, and refused to sign the form. (Doc. 65-15 at 5; BN

268). The time is recorded as 11:30, and the form is also signed by two witnesses. *Id.* Plaintiff denies that he went to recreation that day. (Doc. 85 at 10). Plaintiff argues "this is an obvious lie" because count is from 11:00 a.m. to 12:00 p.m. and there is no recreation at 11:30. *Id.* The next day, Plaintiff filed an HSRF, again complaining that he was supposed to have his splint removed after six weeks and had yet to receive follow-up x-rays. (Doc. 65-7 at 11; BN 115). Nurse's notes indicate a follow-up appointment was scheduled for August 18, 2014. *Id.*

On August 19, 2014, Plaintiff submitted another HSRF complaining that he was supposed to be seen but medical "forgot about [him] again." (Doc. 65-7 at 10; BN 114; Doc. 65-15 at 4; BN 267). According to Nurse Bradshaw, Plaintiff was a no-show the previous day and that Plaintiff "refused to come per security." (Doc. 65-7 at 10; BN 114). Again, Plaintiff denies ever refusing an appointment. (Doc. 85 at 10-11). Plaintiff points out that he did not sign these refusal forms, and again states he would have been disciplined for refusing to attend the appointments or sign the forms. *Id.*

A nurse's note completed August 26, 2014, states Plaintiff was seen going to recreation without his splint on. (Doc. 65-7 at 9; BN 113). Plaintiff does not deny that he took his splint off; rather, he says that Nurse Bradshaw told him on August 7, 2014, that he could take his splint off since he had been wearing it for eight weeks. (Doc. 85 at 11). Plaintiff states that if he was seen not wearing a splint, it was because Nurse Bradshaw told him he could. *Id.*

On September 1, 2014, Plaintiff submitted an HSRF stating his hand and wrist hurt "extremely bad," that there was definitely something wrong with them, and his bone was raising the skin on the back of his hand. (Doc. 65-7 at 8; BN 112). Nurse Bradshaw

treated Plaintiff two days later. (Doc. 65-7 at 7; BN 111). Plaintiff reported his pain was 5/10, and Nurse Bradshaw noted an obvious deformity and that Plaintiff was not wearing his splint. *Id.* Nurse Bradshaw wrote that Plaintiff stated it was "no good." *Id.* Plaintiff denies ever saying his splint was "no good" or not working. (Doc. 85 at 11).

Plaintiff filed another HSRF on September 9, 2014, asking to be seen because his hand and wrist hurt and he was out of Tylenol. (Doc. 65-7 at 6; BN 110). On September 11, 2014, Plaintiff was given a box of Tylenol and an appointment was scheduled for September 16, 2014. *Id.* At that appointment, Plaintiff reported pain at 4-5/10 with movement or palpitation, and the examining physician requested an outside consult for an MRI of Plaintiff's wrist. (Doc. 65-7 at 5; BN 109). Four days later, on September 20, 2014, Nurse Bradshaw wrote that Plaintiff was seen going to recreation without a splint or bandage on his wrist, stating "it does me no good." (Doc. 65-7 at 4; BN 108). Nurse Bradshaw educated Plaintiff on the importance of stabilizing his hand and wrist, but Plaintiff continued to recreation without wearing a splint or bandage. *Id.*

On October 2, 2014, Defendant Bixenman saw Plaintiff again, prescribed more Tylenol, and gave Plaintiff his prior x-ray reports. (Doc. 65-7 at 3; BN 107). X-rays taken the following day showed no significant healing or worsening of Plaintiff's condition. (Doc. 65-11 at 8-9; BN 186-87). Defendant Bixenman requested an MRI for Plaintiff on October 14, 2014. (Doc. 65-412 at 18; BN 221). On October 16, 2014, Dr. Staber denied the MRI request and instead recommended Plaintiff see an orthopedist, who should then decide if an MRI was necessary. (Doc. 65-12 at 9; BN 212).

On November 10, 2014, Dr. Deana Mercer, an orthopedist, saw Plaintiff at the University of New Mexico Hospital. (Doc. 65-12 at 12-13; BN 215-16). Plaintiff reported

pain at 0/10, and he had no swelling or bruising around his wrist. *Id.* Dr. Mercer recommended Plaintiff receive a CT scan of his wrist and she would reevaluate him afterward. *Id.* Dr. Mercer informed Plaintiff of some surgical options, but she noted he was "minimally symptomatic" and that his wrist only hurt when he turned a wrench. *Id.* Finally, Dr. Mercer gave Plaintiff a thumb gauntlet splint. *Id.* Defendant Bixenman requested Plaintiff receive a CT scan on December 1, 2014. (Doc. 65-2 at 4; BN 22).

On December 9, 2014, Defendant Bixenman completed an appointment refusal form for Plaintiff's follow-up appointment. (Doc. 65-15 at 2; BN 265). Plaintiff's signature is on this refusal form. *Id.* The next day, Plaintiff filed an HSRF requesting another appointment. (Doc. 65-6 at 16; BN 103). Plaintiff stated he was scheduled to see someone, but he waited three hours and had to go wrap presents for kids because that was the only time he was allowed to do so. *Id.* Plaintiff explained he was not refusing medical service, just refusing to wait. *Id.* In his Response, Plaintiff denies signing the refusal form and asks the Court to compare the signature on that form with his signature elsewhere in the record, implying the signature is forged. (Doc. 86 at 3). Plaintiff does not address his signed HSRF filed the next day. On December 12, 2014, Plaintiff received a CT scan of his wrist and hand at the Lea Regional Medical Center. (Doc. 65-11 at 6; BN 184). Defendant Bixenman reviewed the CT scan Final Report and scheduled a follow-up. *Id.*

According to physician's notes for Plaintiff's December 18, 2014, follow-up, Plaintiff had "no complaints," his pain was well-managed, and he had full range of motion and strength in both his fingers and wrists. (Doc. 65-6 at 14; BN 101). Plaintiff disputes that he had no complaints and that his pain was well-managed. (Doc. 86 at 6).

Rather, Plaintiff states he told the provider he had no pain if he was not active, but he experienced great pain if he was active. *Id.*

On January 6, 2015, Plaintiff filed an HSRF complaining that his wrist "is hurting extremely bad and medical has done nothing." (Doc. 65-6 at 12; BN 99). On January 8, 2015, Nurse Bradshaw saw Plaintiff and noted Plaintiff was not wearing his brace as ordered. *Id.* at 11; BN 98. Plaintiff stated his pain was at 8/10, Nurse Bradshaw indicated an obvious deformity at Plaintiff's right wrist, and she advised him to continue wearing his brace. *Id.*

On January 19, 2015, Plaintiff attended his follow-up at UNMH. (Doc. 65-12 at 4; BN 207). However, the CT scan of Plaintiff's wrist was not included with the materials sent with Plaintiff. *Id.* Dr. Mercer asked to follow-up with Plaintiff in three months. *Id.* The next day, a prison doctor requested a second CT scan of Plaintiff's wrist. (Doc. 65-12 at 3; BN 206).

Plaintiff received the second CT scan on March 17, 2015. (Doc. 65-11 at 4; BN 182). The report noted no interval change compared to the last CT, and also noted several cysts. *Id.* On March 26, 2015, Defendant Bixenman signed the report, *id.*, and requested an outside consultation to review the second CT, (Doc. 65-12 at 2; BN 205). Dr. Patrick Arnold, then Regional Director, denied the request and asked what the medical necessity of the consultation was, what effects Plaintiff's wrist was having on his activities of daily living, and what other interventions had been attempted. *Id.* Defendant Bixenman ordered a follow up to discuss those topics with Plaintiff. (Doc. 65-2 at 4; BN 22).

On April 2, 2015, Plaintiff was examined by Dr. Alan Boyar, who noted that Plaintiff's activities of daily living were not affected by his hand and wrist. (Doc. 65-6 at 4; BN 91) ("no impact on ADL's"). Dr. Boyar noted there was no indication of a need for surgical repair based on his examination, and he advised Plaintiff to continue with pain medication. *Id.* Defendant Calvillo signed these notes. *Id.* On April 20, 2015, Plaintiff saw Defendant Bixenman for a follow-up on his wrist. (Doc. 65-5 at 16; BN 86). Plaintiff reported his wrist felt better, but he had pain in his third finger. *Id.* Defendant Bixenman noted good range of motion and ordered more Tylenol and x-rays. *Id.* Nonetheless, on April 23, 2015, Plaintiff filed an HSRF saying his hand and wrist were still bothering him, and that he also wanted to be seen about getting sick, his ankle, and his teeth. (Doc. 65-5 at 15; BN 85). Nurse's notes indicated Plaintiff had an appointment for May 4, 2015. *Id.*

X-rays taken April 24, 2015 showed "no significant degenerative changes" between those taken in June 2014. (Doc. 65-11 at 1-2; BN 179-80). On April 27, 2015, Plaintiff submitted another HSRF complaining again that his hand and wrist were still bothering him, his ankle still hurt, he had not been seen for his teeth, and was suffering heart burn. (Doc. 65-5 at 14; BN 84). N noted an appointment for May 4. *Id.*

On May 4, 2015, Defendant Bixenman evaluated Plaintiff and reordered x-rays of Plaintiff's fingers. (Doc. 65-5 at 13; BN 83). Those x-rays showed an old, healed fracture and otherwise normal findings. (Doc. 65-10 at 21; BN 178). On August 10, 2015, Plaintiff presented complaining of intermittent pain in his right hand. (Doc. 65-4 at 9; BN 62). The examining physician noted Plaintiff had a full range of motion, with pain on a twisting motion. *Id.* Ultimately, though, the physician recommended Plaintiff ice his wrist

at night for 20-30 minutes at a time and practice strengthening exercises. *Id.* Plaintiff

alleges that, at this appointment, he was told nothing more could or would be done for

his hand and wrist. (Doc. 87 at 21).

4. <u>*Whether Defendants Were Deliberately Indifferent to Plaintiff's Serious*</u>
<u>*Medical Needs*</u>

The parties do not dispute that Plaintiff's injuries were sufficiently serious to

satisfy the objective prong of the two-part test. The only issue before the Court is

whether Plaintiff has met the subjective prong; that is, whether evidence, viewed in the

light most favorable to Plaintiff, shows that Defendants both knew of and disregarded an

excessive risk to Plaintiff's health. *Farmer*, 511 U.S. at 837. Liberally construed, Plaintiff

claims the subjective prong has been met and Defendants were deliberately indifferent

in several different ways, which will be reviewed in turn.

a. *Whether Initial Delays Constituted Deliberate Indifference*

First, Plaintiff claims the initial delay between his injury and receiving treatment

evidences Defendants' deliberate indifference. (Doc. 85 at 7-8); (Doc. 86 at 5). Plaintiff

states he was forced to suffer in extreme pain for approximately 20 days without any

pain medication. *Id.* As discussed, prison officials may be liable under the Eighth

Amendment when they delay or deny treatment for a condition that obviously needs

medical attention. *See Self*, 439 F.3d at 1231; *Heidtke*, 489 Fed. Appx. at 280. In this

case, Plaintiff alleges nurses and CO Fuentes observed his purple, swollen wrist and

hand, yet he was not treated until nearly three weeks after his injury. (Doc. 65-8 at 2;

BN 123). When Defendant Bixenman finally treated Plaintiff, she observed blue and

green bruising and swelling. (Doc. 65-8 at 2; BN 123). Viewed in the light most

favorable to Plaintiff, this evidence shows it was obvious Plaintiff needed treatment.

However, there is no evidence in the record that any of Defendants observed or knew of the obviousness of Plaintiff's injury until Defendant Bixenman treated him on May 13, 2014. Although the obviousness of Plaintiff's injury may give rise to a claim against the nurses and CO Fuentes, Plaintiff did not name them as defendants. Accordingly, there is no genuine dispute of material fact as to whether Defendants knew Plaintiff obviously needed treatment and intentionally delayed or denied it.

Regarding Plaintiff's claim that he was left to suffer in extreme pain, when Defendant Bixenman first examined Plaintiff, he reported his pain was 5/10, and Defendant Bixenman prescribed ibuprofen. (Doc. 65-8 at 2; BN 123). Twelve days later, Plaintiff requested Tylenol instead out of concern for his kidney. (Doc. 65-8 at 1; BN 122). When Nurse Bradshaw followed-up with Plaintiff later, Plaintiff reported pain at 3/10, and she noted his request for Tylenol instead of ibuprofen. (Doc. 65-7 at 17; BN 121). Defendant Bixenman continued to prescribe pain medication as she followed up with Plaintiff, and he has not cited any instance where Defendants ignored his complaints of pain. *See* (Doc. 65-7 at 15; BN 119). Instead, Plaintiff's only request in the record regarding pain medication dealt with his preference for Tylenol over ibuprofen. This evidence viewed in the light most favorable to Plaintiff, does not show that Defendants knew of and disregarded Plaintiff's pain. *See Jones v. Simek*, 193 F.3d 485, 487, 490 (7th Cir. 1999) (denying summary judgment where inmate allegedly asked for and was refused pain medication for injured arm and hand).

Plaintiff cites *Hathaway v. Coughlin*, 37 F.3d 63 (2nd Cir. 1994), as part of his argument that his injury caused him significant pain and, therefore, Defendants were deliberately indifferent. (Doc. 65 at 15). In *Hathaway*, an inmate suffered intense pain

for years due to broken metal pins in his hip. 37 F.3d at 65. However, the facility's doctors did not tell the inmate about the broken pins or that they could perform surgery to remove the pins. *Id.* On review, the Second Circuit found a rational jury could infer deliberate indifference because the doctors never informed the inmate about the broken pins in his hip or that surgery could address his pain. *Id.* at 67-68.

*Hathaway* is significantly different from this case given that Defendants did not hide Plaintiff's condition from him or refuse to treat his pain. Although Defendant Bixenman initially diagnosed Plaintiff's injury as a sprain, Defendants did not hide the fact that he actually suffered fractures. Again, Plaintiff was regularly prescribed pain medication, and there is no evidence Defendants ever refused Plaintiff medication. Accordingly, Defendants' conduct does not rise to the level of indifference in *Hathaway*, and a rational jury could not infer that Defendants were deliberately indifferent to Plaintiff's pain.

### b. Whether Subsequent Delays Constituted Deliberate Indifference

Plaintiff also alleges that the general delays and missed appointments he experienced constitute deliberate indifference. For instance, Plaintiff highlights that his hand and wrist were not placed in a stint for more than two weeks after Defendant Bixenman learned he suffered fractures, (Doc. 85 at 8), and that the CT scan of his wrist was not included in materials sent to UNMH, (Doc. 86 at 3). Defendants argue the record shows Defendants did not interfere with or purposefully delay Plaintiff's treatment. (Doc. 65 at 5); (Doc. 88 at 4).

The record shows significant gaps, sometimes months, between Plaintiff's treatments, and Defendants do not dispute Plaintiff's allegation that the prison was

responsible for ensuring the CT scan was sent with Plaintiff to UNMH. As discussed above, Plaintiff disputes that he ever refused to attend his medical appointments as reflected in the *Martinez* Report. Because Plaintiff has disputed the record in an affidavit, the Court may not resolve the issue of whether or not Plaintiff refused to attend his appointments. *See Hall*, 935 F.2d at 1109, 1111.

However, even viewing the evidence in the light most favorable to him, Plaintiff has not pointed to evidence showing the delays were the result of Defendants intentionally or purposefully delaying his treatment. *See Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) (stating in order to avoid summary judgment, an inmate "must offer some evidence" prison officials intentionally denied or delayed treatment). Plaintiff has not alleged that Defendants intentionally canceled Plaintiff's appointments or purposefully avoided treating him. In his HSRFs and Response, Plaintiff instead argues that Defendants "forgot" about him. *See* (Doc. 65-15 at 4; BN 267); (Doc. 85 at 14, 16); (Doc. 87 at 46). Forgetting Plaintiff may have been negligent, but the "negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation." *Perkins*, 165 F.3d at 811.

Liberally construed, Plaintiff also argues the delays speak for themselves. (Doc. 65 at 15-17). However, in *Self*, the Tenth Circuit held that "where a doctor orders treatment consistent with the symptoms presented and then continues to monitor the patient's condition, an inference of deliberate indifference is unwarranted." *Self*, 439 F.3d at 1232-33. Defendants treated Plaintiff's symptoms and monitored his condition for more than a year following his injury. Indeed, the record shows Plaintiff received care regularly from several nurses and doctors, numerous x-rays of his hand and wrist,

two CT scans, and two meetings with an outside orthopedist. Defendant Bixenman in particular set multiple appointments with Plaintiff and requested off-site consultations. *See* (Doc. 65-2 at 6; BN 24); (Doc. 65-12 at 17; BN 220). Accordingly, under *Self*, an inference of deliberate indifference is unwarranted in this case.

### c. Whether Defendant Douglas' and Nurse Bradshaw's Statements Showed Deliberate Indifference

Next, Plaintiff claims Defendant Douglas' and Nurse Bradshaw's statements show Defendants were deliberately indifferent. Specifically, Plaintiff emphasizes Defendant Douglas' statements that both the medical unit and COs "had made some mistakes" and that Plaintiff would have been treated if he had been taken to the medical unit right away, as well as Nurse Bradshaw's statement that "there is a flaw in the system" because it should not take two weeks to receive x-ray reports. (Doc. 87 at 3, 5).

In order to meet the subjective prong, Defendants must both know of and disregard an excessive risk to Plaintiff's health. *Farmer*, 511 U.S. at 837. The ""[i]nadvertent failure to provide adequate medical care" is insufficient to find an Eighth Amendment violation. *Estelle*, 429 U.S. at 105. Here, although the statements Plaintiff cites reflect recognition of fault or a "flaw" in the system, they do not establish that Defendants knew of Plaintiff's injuries and disregarded them. Once Defendant Douglas learned of Plaintiff's injuries, he took action to see that Plaintiff was treated by personally taking him to be seen, and Defendant Bixenman acted once she received and reviewed the x-ray reports. Defendant Douglas' statements establish an inadvertent failure to treat Plaintiff sooner, but that is not enough to establish an Eighth Amendment violation. *Estelle*, 429 U.S at 105. Accordingly, although Defendant Douglas and Nurse Bradshaw may have recognized fault or flaws in delivering medical care, their

statements do not establish any of Defendants were deliberately indifferent to Plaintiff's medical needs.

### d. Whether Denial of the Consultation Requests Constituted Deliberate Indifference

Plaintiff claims the denials of offsite consultation requests constitute deliberate indifference to his serious medical needs. (Doc. 86 at 5). On June 17, 2014, Dr. Staber denied Defendant Bixenman's request for an orthopedic consultation, stating Plaintiff's fractures could be treated onsite. (Doc. 65-12 at 17; BN 220). On March 26, 2015, Dr. Arnold denied another offsite consultation request pending questions he had about whether Plaintiff needed the consultation. (Doc. 65-12 at 2; BN 205). As a result of Dr. Arnold denying the last consultation request, Dr. Mercer never reviewed a CT scan of Plaintiff's hand and wrist.

Plaintiff's claims here face two problems. First, "absent an extraordinary degree of neglect," the subjective prong is not satisfied "where a doctor merely exercises his considered medical judgment." *Self*, 439 F.3d at 1233. Thus, to the extent the denials reflect the doctors' medical judgments that Plaintiff did not need orthopedic consultations, the denials do not constitute Eighth Amendment violations. Second though, Dr. Staber and Dr. Arnold are not defendants in this case, and none of the named Defendants were responsible for denying the consultation requests. The denials therefore do not establish that Defendants were deliberately indifferent, and the Court finds Defendants are entitled to summary judgment on this claim.

*e. Whether Not Placing Plaintiff's Wrist in a Cast Constituted Deliberate Indifference*

Related to the denials of the consultation requests, Plaintiff alleges Defendants were deliberately indifferent given the fact that his hand and wrist were never placed in a cast. (Doc. 86 at 2). When Dr. Staber denied the initial offsite consultation request, she wrote that Plaintiff may be treated by splinting his finger for 4-6 weeks and casting his wrist for another 4-6 weeks. (Doc. 65-2 at 17; BN 220). Plaintiff's wrist was never put in a cast. Instead, Defendant Bixenman splinted Plaintiff's wrist, and Plaintiff was ordered to continue wearing a brace or splint throughout his treatment. *See* (Doc. 65-6 at 11; BN 98). No other doctors recommended a cast, and Dr. Mercer also gave Plaintiff a splint when she saw him at UNMH. (Doc. 65-2 at 4; BN 22).

As discussed, the subjective prong is not satisfied "where a doctor merely exercises his considered medical judgment." *Self*, 439 F.3d at 1233. This includes judgments about what treatment or therapy to prescribe. *See Callahan v. Poppell*, 471 F.3d 1155, 1160 (10th Cir. 2006); *Perkins*, 165 F.3d 803, 811. In *Callahan*, two doctors recommended the plaintiff be given a wheelchair, but other doctors gave him crutches instead. *Callahan*, 471 F.3d at 1159-60. The Tenth Circuit held the dispute amounted to a disagreement of medical judgments about whether the plaintiff should use crutches or be confined to a wheelchair, but not an Eighth Amendment violation, as inmates do not have a right "to a particular course of treatment." *Id.* at 1160. Similarly here, the decision to place Plaintiff's hand and wrist in splints and braces, rather than a cast, amounts to a difference in medical judgment. Even if a cast may have been better, the fact that Plaintiff did not receive one does not mean Defendants violated the Eighth Amendment.

Plaintiff cites *White v. Napoleon*, 897 F.2d 103 (3rd Cir. 1990) in support of his argument that Defendants were deliberately indifferent by not placing his arm and wrist in a cast. (Doc. 85 at 21). *White* involved a prison doctor who allegedly intentionally prescribed ineffective treatment and wantonly inflicted pain on his patients without medical reasons. *See White*, 897 F.2d at 106-08. For instance, according to the inmates' complaint, the doctor once lit a book of matches and held them to an inmate's hands, severely burning them, because the doctor did not believe the inmate's complaints that he lost feeling in his hands. *Id.* at 108. Several inmates alleged that the doctor violated their Eighth Amendment rights by prescribing different medications or treatments than their prior physicians. *Id.* at 106-08.

On review after the inmates' complaint was dismissed, the Third Circuit stated that the Eighth Amendment is not violated when one doctor "disagrees with the professional judgment of another doctor. There may, for example, be several acceptable ways to treat an illness." *Id.* at 110. Accordingly, the prison doctor did not violate the Eighth Amendment simply by prescribing different medications or treatment. *Id.* at 110-111. However, to the extent the inmates alleged the doctor intentionally inflicted pain or deliberately prescribed ineffective treatment, they stated valid claims. *Id.*

In this case, Plaintiff has not argued or pointed to evidence in the record demonstrating that Defendants intentionally refused to put his arm and wrist in a cast as a means of deliberately inflicting pain or pursuing ineffective treatment. Although Dr. Staber stated Plaintiff's injury may be treated in part by immobilization in a cast, Defendant Bixenman and Dr. Mercer both prescribed Plaintiff splints and braces instead. Here, as in *Callahan*, "[a]t worst, the defendants may have committed

malpractice, but the Eighth Amendment does not redress such a claim." 471 F.3d at 1160. The Court therefore finds there is no genuine dispute of material fact and Defendants are entitled to judgment as a matter of law on this claim as well.

### f. Whether Defendants Were Deliberately Indifferent by Failing to Follow Policy or Fulfill Their Job Duties

Finally, Plaintiff claims that Defendants were deliberately indifferent because several of Defendants' job duties and relevant policies were not followed. In particular, Plaintiff states that prison policies required sick call to be held five days a week and that HSRFs be responded to within 24 hours, but neither policy was followed. (Doc. 86 at 4); (Doc. 87 at 11). Plaintiff argues that Defendant Calvillo, as the Director of Nursing, knew about problems with sick call and should have acted sooner to remedy those problems. (Doc. 87 at 11). Further, Plaintiff alleges Defendant Douglas failed to ensure adequate medical staff were available. (Doc. 87 at 12).

The Court notes that Defendants did not originally include policies and procedures in their *Martinez* Report, contrary to the Court's order. (Doc. 51 at 2-3). Plaintiff moved to strike the *Martinez* Report for its failure to comply with the Court's order. (Doc. 76). Defendants responded by arguing the policies and procedures are not relevant to Plaintiff's claims. (Doc. 77 at 2-3). Ultimately, the Court ordered Defendants to supplement the *Martinez* Report to comply with the Court's order and gave Plaintiff time to respond to the supplemented material. (Doc. 89). Defendants then filed a supplemental *Martinez* Report, (Doc. 90), containing policies and procedures pertaining to patient care and Plaintiff's prison grievances. Defendants maintain that the documents provided "have no bearing on" the analysis of Plaintiff's claims. *Id.* at 2.

Prisoners proceeding *pro se* are at a significant disadvantage in civil litigation given the fact they are incarcerated. The Tenth Circuit has found ordering *Martinez* Reports "not only proper but necessary for the orderly consideration of the issues" in cases filed by *pro se* prisoners. *Martinez v. Aaron*, 570 F.2d 317, 319 (10th Cir. 1978). The purpose of the Report is to "ascertain whether there is a factual and legal basis for the prisoner's claims." *Gee v. Estes*, 829 F.2d 1005, 1007 (10th Cir. 1987); *see also Northington*, 973 F.2d at 1521 ("This process is designed to aid the court in fleshing out possible legal bases of relief from unartfully drawn pro se prisoner complaints . . ."). Given this background, defendants cannot determine for themselves what information is relevant to a plaintiff's claims, or be allowed to ignore court orders on the grounds that the information ordered produced is irrelevant to the plaintiff's claims. Otherwise, defendants could undercut the purpose of the *Martinez* Report process by withholding evidence favorable to a plaintiff while claiming it is irrelevant.

Now that Defendants have filed the necessary information, in his response to the supplemental *Martinez* Report Plaintiff argues that policies regarding sick call and HSRFs were not followed while he was being treated. (Doc. 94 at 2). Plaintiff cites the contract signed by NMCD's healthcare provider, which provides that sick call shall be held routinely five days a week. (Doc. 90-46 at 26; BN 530). Plaintiff also cites a healthcare policy requiring HSRFs to be answered within 48 hours. (Doc. 90-52 at 21; BN 661). Plaintiff also argues staffing and hour policies were not followed, and that Defendants intentionally failed to follow these policies. (Doc. 94 at 2-3). Finally, Plaintiff contends Defendants failed to provide the Health Service Administrator job description, and failed to produce Defendants' annual peer reviews. *Id.* at 3-4.

Nevertheless, Plaintiff has not shown how violation of any policies or procedures establishes that Defendants were intentionally indifferent to his medical needs. Plaintiff has not shown how Defendants knew of and disregarded excessive risks to Plaintiff's health by failing to ensure staffing policies were followed, conducting sick call five days a week, or responding to his HSRFs in a timely manner. *See Farmer*, 511 U.S. at 837 (stating Eighth Amendment liability lies where a prison official "knows of and disregards an excessive risk to inmate health or safety"). Plaintiff must go beyond stating as a conclusion that Defendants "deliberately" failed to ensure policies were followed; he must point to evidence in the record that Defendants were deliberately indifferent to his pain. *See Panis*, 60 F.3d at 1490; *Brown v. Hughes*, 894 F.2d 1533, 1539 (11th Cir. 1990) (although no nurse was present to treat plaintiff as required by policy, plaintiff did not show named defendants knew of and ignored his injury). In addition, Plaintiff has not shown how the Health Service Administrator job description or Defendants' annual peer reviews are relevant to or support any of Plaintiff's claims. Therefore, the Court recommends granting summary judgment on this claim.

## III.    Conclusion

For the foregoing reasons, the Court finds that deferring a ruling on Defendants' Motion for Summary Judgment is unnecessary. Further, Defendants have shown there is no genuine dispute of material fact and that they are entitled to judgment as a matter of law. The Court therefore **RECOMMENDS** that Plaintiff's *Motion to Suspend Summary Judgment*, (Doc. 79), be **DENIED**; Defendants Bixenman, Calvillo, and Douglas' Martinez *Report and Motion for Summary Judgment*, (Doc. 65), be **GRANTED**, and

Plaintiff's *Prisoner's 1st Amended Civil Rights Complaint*, (Doc. 19), be **DISMISSED**

**WITH PREJUDICE.**

> **THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

_____
THE HONORABLE CARMEN E. GARZA
CHIEF UNITED STATES MAGISTRATE JUDGE